IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

IN RE:  BARRY K. KELLERMAN and                    CASE NO.: 4:09-bk-13935
        DANA M. KELLERMAN, DEBTORS                CHAPTER 7

## MEMORANDUM OPINION

The debtors filed their voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court, Eastern District of Arkansas, on June 3, 2009. On motion and with the debtors' consent, the court converted their case to a Chapter 7 proceeding on January 28, 2014, and appointed M. Randy Rice ("Trustee") as trustee of the debtors' estate. The Trustee and a creditor, Arvest Bank ("Arvest"), filed symbiotic objections to the debtors' exemption of an individual retirement account ("IRA") owned by and in the name of the joint debtor, Barry Kellerman. The objections came for hearing on April 29, 2015. At the conclusion of the evidence, the court took the matter under advisement. For the reasons stated below, the objections to the claimed exemption are sustained.

### I. Jurisdiction

This court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052 made applicable to this proceeding under Federal Rule of Bankruptcy Procedure 9014.

### II. Findings of Fact

Prior to his bankruptcy case, Barry Kellerman created the IRA, which as of October 27, 2008, had a reported value of $252,112.67. (Arvest Ex. 4, at 1.) The named administrator of the IRA is Entrust Mid South, LLC ("Entrust"). The IRA is self-directed by Barry Kellerman who

Entered On Docket: 05/26/2015

made all of the decisions pertinent to the issues raised in the objections. At the commencement of their case, the debtors valued the IRA at $180,000.00 and claimed the entire fund as exempt pursuant to 11 U.S.C. § 522(d)(12). (Arvest Ex. 1, at 8.)

Arvest and the Trustee object to the debtors' claimed exemption in the IRA on the basis that it was no longer exempt from taxation under the Internal Revenue Code as of the commencement of the case and, accordingly, is not eligible for exemption under 11 U.S.C. § 522(d)(12). They allege that the IRA lost its exempt status in 2007 because Barry Kellerman directed the IRA to engage in prohibited transactions involving disqualified persons as defined by the Internal Revenue Code. At trial, the parties conceded, or tacitly recognized, that the transactions involved disqualified persons; the debtors did not argue or suggest that any of the parties involved were not disqualified persons. Thus, the remaining issue principally concerns whether the transactions were prohibited transactions as defined in 26 U.S.C. § 4975(c).

The alleged prohibited transactions involve the 2007 acquisition of approximately four acres of real property located near Maumelle, Arkansas. Panther Mountain Land Development, LLC ("Panther Mountain") played a precipitating and integral role in the purchase. Barry Kellerman and his wife each own a 50 percent interest in Panther Mountain. (Arvest Ex. 5, at 28.) The address for Panther Mountain is the same as Barry Kellerman Construction, Inc. and is the debtors' home address. (Arvest Ex. 1, at 32.) Barry Kellerman is also a co-debtor on a number of debts with Panther Mountain. (Arvest Ex. 1, at 23.)

To effect the acquisition and development of the four-acre property, the IRA and Panther Mountain formed a partnership by executing a Partnership Agreement dated August 8, 2007. (Debtors' Ex. 2.) Barry Kellerman, executed the Partnership Agreement on behalf of Panther Mountain. (Debtors' Ex. 2, at 3.) Jerry O. Pearson, Jr. executed the Partnership Agreement on

behalf of the IRA.  (Debtors' Ex. 2, at 3.)   Barry Kellerman is the only person specifically designated to sign partnership checks.  (Debtors' Ex. 2, at 2.)  The Partnership Agreement does not disclose Panther Mountain's ownership.  The partnership operated under the name Entrust Mid South LLC FBO Barry Kellerman IRA #0605002–01 and Panther Mountain Land Development, LLC ("Entrust Partnership").  (Debtors' Ex. 2, at 1.)

Although the IRA and Panther Mountain each possessed a 50 perecent interest, the Partnership Agreement called for the IRA to deliver the real property as a "Noncash Contribution[]" valued at $122,830.56.  (Debtors' Ex. 2.)  The IRA was also called upon to make a "Cash Contribution[]" of $40,523.93 by November 30, 2007.  (Debtors' Ex. 2.)  Panther Mountain's sole obligation was a cash contribution of $163,354.49—an amount equal to the IRA's cash and non-cash contribution values—at an unspecified "construction completion" date. (Debtors' Ex. 2.)  Neither party introduced testimony or evidence that Panther Mountain ever partially or fully made its cash contribution.  (Arvest Ex. 5, at 17.)

Exactly one day after the formation of the Entrust Partnership, Barry Kellerman directed the IRA to liquidate assets in the amount of $123,000.  (Arvest Ex. 6.)  His August 9, 2007 Sell Direction Letter ("Sell Letter") illuminates the relationship between Barry Kellerman, the beneficiary of the IRA, and Entrust, the plan administrator, and contradicts the debtor's assertion that the administrator sanctioned or approved of the transaction as consistent with the IRA's tax exempt status.  Specifically, the Sell Letter makes Entrust's role clear, stating:

> I understand that my account is self-directed and that Entrust . . . will not review the merits, legitimacy, appropriateness and/or suitability of any investment in general, including, but not limited to, any investigation and/or due diligence prior to selling any investment, or in connection with my account in particular. . . . I understand that neither the Administrator nor the Custodian determine whether this investment is acceptable under the Employment Retirement Income Securities Act (ERISA), the Internal Revenue Code (IRC), or any applicable federal, state, or local laws, including securities laws.  I understand that it is my

3

>responsibility to review any investments to ensure compliance with these requirements.

(Arvest Ex. 6, at 1.) Further,

>I am directing you to complete this transaction as specified above. I confirm that the decision to sell this asset is in accordance with the rules of my account, and I agree to hold harmless and without liability the Administrator and/or Custodian of my account under the foregoing hold harmless provision.

(Arvest Ex. 6, at 2.) By a separate Buy Direction Letter dated August 8, 2007, Barry Kellerman directed Entrust to buy the four-acre tract through Standard Abstract & Title Co. for a purchase price of $122,830.56. (Arvest Ex. 6, at 3.) Terms contained in the Buy Direction Letter mirror the exculpatory and disclaimer language found in the Sell Letter.

The purchase of the four-acre tract also took place on August 8, 2007. Barry Kellerman made the decision to purchase the four acres. The purchase took place principally to complement and assist in the development of two nearby tracts of approximately 80 and 120 acres owned by Panther Mountain. While the four-acre tract could be independently developed, controlling it substantially assisted in the development of the other Panther Mountain properties. The IRA funded the entire purchase price. (Arvest Ex. 3.) The Warranty Deed from Maumelle Development, LLC, dated August 8, 2007, did not convey the property to the Entrust Partnership; rather, the seller conveyed the tract to the IRA and Panther Mountain with each owning an undivided one-half interest. (Arvest Ex. 2.) This undivided one-half interest is the sole remaining asset in the IRA. Confusingly, the IRA's October 27, 2008 Account Statement reflects the full value of the real estate as an asset of the IRA without reference to its divided interest. (Arvest Ex. 4, at 1.)

The IRA's contributions did not end with the property purchase. On December 5, 2007, the IRA, as a "Business Expense," paid $40,523.93 to develop the property; Barry Kellerman

4

characterized this amount as design and engineering expenses. (Arvest Ex. 4, at 4.) The IRA paid an additional "Business Expense" of $411.82 on October 15, 2008. (Arvest Ex. 4, at 4.) On his individual bankruptcy schedules, Barry Kellerman shows distributions from the IRA of $12,349.99 in 2009, $124,100.74 in 2008, but none in 2007. (Arvest Ex. 1, at 28.)

Panther Mountain filed its own Chapter 11 bankruptcy on September 20, 2009, shortly after the Kellermans commenced their bankruptcy proceeding on June 3, 2009. (Arvest Ex. 5.) On its schedules, Panther Mountain lists both the Kellermans and the IRA as unsecured creditors. (Arvest Ex. 5, at 17–18.) Specifically, two debts are reflected as owed to the IRA: (1) $163,000.00 with the claim described as "50% Interest in new entity," and (2) $7,891.96 with the claim described as "Loans from B Kellerman IRA to PMLD, LLC." (Arvest Ex. 5, at 4, 11, 17–18.) Barry Kellerman's testimony regarding the $7,891.96 debt was unclear. He alternatively characterized it as money that he and his wife paid personally for Panther Mountain or money that did, in fact, come from the IRA. As stated, it is scheduled as a debt to the IRA and not as a debt to the Kellermans.

### III. Discussion

The Trustee and Arvest object to the debtors' use of 11 U.S.C. § 522(d)(12) to exempt the IRA. Subsection 522(d)(12) provides that "[t]he following property may be exempted under subsection (b)(2) of this section . . . . (12) [r]etirement funds to the extent that those funds are in a fund or account that is exempt from taxation under section 401, 403, 408, 408A, 414, 457, or 501(a) of the Internal Revenue Code of 1986." 11 U.S.C. § 522(d)(12) (2014).

### A. Burden of Proof

"When a debtor files a bankruptcy petition, 'all legal or equitable interest of the debtor in property' becomes property of the bankruptcy estate subject to claims by creditors." *Res-Ga*

*Gold, LLC v. Cherwenka* (*In re Cherwenka*), 508 B.R. 228, 234 (Bankr. N.D. Ga. 2014) (citing 11 U.S.C. § 541(a)). However, "the Bankruptcy Code allows certain interests in property to be exempt[ed] from the bankruptcy estate" pursuant to 11 U.S.C. § 522. *Id.*

A debtor's claim of exemption is "presumptively valid." *Danduran v. Kaler* (*In re Danduran*), 657 F.3d 749, 754 (8th Cir. 2011) (citing *Stephens v. Hedback* (*In re Stephens*), 425 B.R. 529, 533 (B.A.P. 8th Cir. 2010)). Thus, pursuant to Federal Rule of Bankruptcy Procedure 4003, an "objecting party has the burden of proving that the [debtors'] exemptions are not properly claimed." FED. R. BANKR. P. 4003(C) (2014). "If the [objecting party] meets this burden to produce evidence in support of the objection, the burden of production shifts to the debtor[s] to show that the claimed exemption is proper." *Danduran*, 657 F.3d at 754 (citing *Walters v. Bank of the West* (*In re Walters*), 450 B.R. 109, 113 (B.A.P. 8th Cir. 2011)). Consequently, the burden of persuasion remains with the objecting party who must prove his case by a "preponderance of the evidence." *In re Williams*, No. 09–43872–A–7, 2011 WL 10653865, at *2 (Bankr. E.D. Cal. June 3, 2011) (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991)).

### B.  Section 408

Section 408 of 26 U.S.C. frames the analysis of whether the IRA remains exempt from taxation and whether the debtors' claimed exemption is proper. Section 408 defines an individual retirement account as a "trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries[.]" 26 U.S.C. § 408(a) (2014). Subsection (e) addresses the tax implications and specifically states:

> (1) Exemption from tax—Any individual retirement account is exempt from taxation under this subtitle unless such account has ceased to be an individual retirement account by reason of paragraph (2) or (3) . . . .

(2) Loss of exemption of account where employee engages in prohibited transaction.

(A) In general—If, during any taxable year of the individual for whose benefit any individual retirement account is established, that individual or his beneficiary engages in any transaction prohibited by section 4975 with respect to such account, such account ceases to be an individual retirement account as of the first day of such taxable year. For purposes of this paragraph—

(i) the individual for whose benefit any account was established is treated as the creator of such account, and

(ii) the separate account for any individual within an individual retirement account maintained by an employer or association of employees is treated as a separate individual retirement account.

(B) Account treated as distributing all its assets—In any case in which any account ceases to be an individual retirement account by reason of subparagraph (A) as of the first day of any taxable year, paragraph (1) of subsection (d) applies as if there were a distribution on such first day in an amount equal to the fair market value (on such first day) of all assets in the account (on such first day).

26 U.S.C. § 408(e) (2014). Thus, an individual retirement account remains exempt from taxation pursuant to subsection (e) as long as the owner or beneficiary does not engage in a prohibited transaction. If an owner or beneficiary does engage in a prohibited transaction, the individual retirement account "ceases to be an individual retirement account . . . as of the first day of any taxable year" and is taxable as a distribution. 26 U.S.C. § 408(e)(2)(A), (B).

### C. Disqualified Persons Under Subsection 4975(e)

As discussed below, a prohibited transaction by necessity involves a "disqualified person." Pursuant to subsection 4975(e)(2), a "disqualified person" includes the following individuals and entities:

(A) a fiduciary;
(B) a person providing services to the plan;
(C) an employer any of whose employees are covered by the plan;
(D) an employee organization any of whose members are covered by the plan;

7

      (E) an owner, direct or indirect, of 50 percent or more of—
          (i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation,
          (ii) the capital interest or the profits interest of a partnership, or
          (iii) the beneficial interest of a trust or unincorporated enterprise, which is an employer or an employee organization described in subparagraph (C) or (D);
(F) a member of the family (as defined in paragraph (6)) of any individual described in subparagraph (A), (B), (C), or (E);
(G) a corporation, partnership, or trust or estate of which (or in which) 50 percent or more of—
          (i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation,
          (ii) the capital interest or profits interest of such partnership, or
          (iii) the beneficial interest of such trust or estate, is owned directly or indirectly, or held by persons described in subparagraph (A), (B), (C), (D), or (E);
(H) an officer, director (or an individual having powers or responsibilities similar to those of officers or directors), a 10 percent or more shareholder, or a highly compensated employee (earning 10 percent or more of the yearly wages of an employer) of a person described in subparagraph (C), (D), (E), or (G); or
(I) a 10 percent or more (in capital or profits) partner or joint venturer of a person described in subparagraph (C), (D), (E), or (G).

The Secretary, after consultation and coordination with the Secretary of Labor or his delegate, may by regulation prescribe a percentage lower than 50 percent for subparagraphs (E) and (G) and lower than 10 percent for subparagraphs (H) and (I).

26 U.S.C. § 4975(e)(2) (2014). A fiduciary, as referenced in subsection 4975(e)(2)(A), includes "any person who exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," or "any person who has any discretionary authority or discretionary responsibility in the administration of such plan." 26 U.S.C. § 4975(e)(3)(A), (C) (2014).

      In the present case, the debtors conceded that they are "disqualified persons" pursuant to subsection 4975(e)(2). Specifically, Barry Kellerman is the beneficiary of the IRA and a fiduciary under subsection 4975(e)(2)(A) because he exercises "discretionary authority" and "discretionary control" over the IRA as the owner. Dana Kellerman qualifies as a "member of

8

the family" pursuant to subsection 4975(e)(2)(F) as the wife of Barry Kellerman. Panther Mountain constitutes a "disqualified person" under subsection 4975(e)(2)(G) because Barry Kellerman asserts a 50 percent membership interest. Likewise, the Entrust Partnership is a disqualified person pursuant to subsection 4975(e)(2)(G). Based on the debtors' concessions and the court's findings on disqualified persons, all that remains is a determination of whether a prohibited transaction occurred that terminated the tax exempt status of the IRA.

### D. Prohibited Transactions Pursuant to Subsection 4975(c)

Subsection 4975(c)(1) defines six instances in which a prohibited transaction may occur.

> (1) General rule—For purposes of this section, the term "prohibited transaction" means any direct or indirect—
>
> >(A) sale or exchange, or leasing, of any property between a plan and a disqualified person;
> >(B) lending of money or other extension of credit between a plan and a disqualified person;
> >(C) furnishing of goods, services, or facilities between a plan and a disqualified person;
> >(D) transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan;
> >(E) act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account; or
> >(F) receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan.

26 U.S.C. § 4975(c)(1) (2014). "These enumerated prohibited transactions are not mutually exclusive; one transaction may fall within the parameters of more than one of the identified transactions under section 4975." *Ellis v. Comm'r*, 106 T.C.M. (CCH) 468, 2013 WL 5807593, at *5 (U.S. Tax Ct. Oct. 29, 2013) (citing *Janpol v. Comm'r*, 101 T.C. 518, 525 (1993)). In adopting the list of prohibited transactions, Congress intended "to prevent taxpayers involved in a qualified retirement plan from using the plan to engage in transactions for their own account

9

that could place plan assets and income at risk of loss before retirement." *Id.* (citations omitted). Thus, "[t]he fact that a transaction would qualify as a prudent investment when judged under the highest fiduciary standards is of no consequence." *Id.* (citation omitted).

In *Cherwenka*, the court considered whether a debtor could exempt a self-directed IRA utilized "to invest in distressed real properties and have the IRA realize profit from the later sale of these properties." 508 B.R. at 232. There, the debtor located potential real estate investments, a representative of the IRA executed the purchase documents, and the debtor reviewed the closing statements. *Id.* After flipping and selling a property, the IRA realized all the profits from the sale. *Id.* In contrast to the case before this court, the debtor in *Cherwenka* asserted that he "never jointly owned a property with [the IRA]." *Id.* Although the debtor was a disqualified person based on his ownership of the IRA, the court found that the debtor's involvement in selecting property and participating in other actions taken by the IRA did not constitute a prohibited transaction because the evidence failed to demonstrate that the "IRA-owned properties resulted in any benefit to [the] [d]ebtor outside of the plan." *Id.* at 237.

Similar to the benefit analysis set forth in *Cherwenka*, a United States Department of Labor opinion is equally instructive; wherein, it considered "whether allowing the owner of an IRA to direct the IRA to invest in a limited partnership, in which relatives and the IRA owner in his individual capacity are partners, [] violate[d] section 4975 of the [Internal Revenue] Code." *Office of Pension and Welfare Benefit Programs*, Opinion No. 2000–10A (E.R.I.S.A.), 2000 WL 1094031, at *1 (Dept. of Labor July 27, 2000). Analyzing the facts, the Department of Labor noted that the owner of the IRA was a fiduciary and a disqualified person based on his "investment discretion over the assets of his IRA." *Id.* at *2. Further, the owner of the IRA was a disqualified person based on "his capacity as the general partner of the [p]artnership to the

10

extent he exercise[d] discretionary authority over the administration or management of the IRA assets invested in the [p]artnership" as were his children, who were members of the partnership. *Id.* However, the opinion states that the partnership was "not a disqualified person under section 4975(e)(2)(G) of the [Internal Revenue] Code" because the owner of the IRA only owned 6.5 percent of the partnership. *Id.* Thus, the Department of Labor found that the "IRA's purchase of an interest in the [p]artnership would not constitute a transaction described in section 4975(c)(1)(A) of the [Internal Revenue] Code" because the owner of the IRA would receive no "compensation by virtue of the IRA's investment in the [p]artnership." *Id.* at 3.[1] The Department of Labor additionally stated:

> that if an IRA fiduciary causes the IRA to enter into a transaction where, by the terms or nature of that transaction, a conflict of interest between the IRA and the fiduciary (or persons in which the fiduciary has an interest) exists or will arise in the future, that transaction would violate either 4975(c)(1)(D) or (E) of the [Internal Revenue] Code. Moreover, the fiduciary must not rely upon and cannot be otherwise dependent upon the participation of the IRA in order for the fiduciary (or persons in which the fiduciary has an interest) to undertake or to continue his or her share of the investment.

*Id.* Thus, the Department of Labor held that "an IRA may invest in a partnership," and a "violation of [sub]section 4975(c)(1)(D) or (E) w[ould] not occur merely because the fiduciary derives some incidental benefit from the transaction involving IRA assets." *Cherwenka*, 508 B.R. at 239.

In *Rollins*, the United States Tax Court also looked to the benefit derived in holding that a plan owner was a disqualified person who engaged in prohibited transactions pursuant to subsection 4975(c)(1)(D) by directing his plan to make loans to various entities in which he held a membership interest. *Rollins v. Comm'r*, T.C.M 2004–260, 2004 WL 2580602, at *9 (U.S.

---

[1] The Department of Labor declined to decide whether the IRA's investment in the partnership would violate subsections 4975(c)(1)(D) and (E).

11

Tax Ct. Nov. 15, 2004). The court noted that "[t]he transactions were uses by petitioner or for petitioner's benefit[] of assets of the [p]lan." *Id.* Thus, the "petitioner derived a benefit (as significant part owner of each the [b]orrowers) from the [b]orrowers' securing financing without having to deal with independent lenders" and engaged in a prohibited transaction each time a loan was made. *Id.* at *10.

As discussed above, the debtors conceded and this court finds that the debtors, Panther Mountain, and the Entrust Partnership are disqualified persons pursuant to 26 U.S.C. § 4975(e)(2). In 2007, Barry Kellerman engaged the IRA in transactions including: (1) the purchase of the real property with IRA funds and subsequent conveyance of the real property to the IRA and Panther Mountain (the "non-cash contribution" under the Partnership Agreement), and (2) the cash contribution of $40,523.93 made by the IRA to the Entrust Partnership (the "cash contribution" under the Partnership Agreement). Collectively, individually, and with some redundancy, both the non-cash contribution and the cash contribution constitute "prohibited transactions" with disqualified persons pursuant to subsections 4975(c)(1)(B), (D), and (E), which renders the IRA non-exempt.[2]

Specifically, subsection 4975(c)(1)(B) proscribes the "lending of money or other extension of credit between a plan and a disqualified person[.]" At trial, the debtors argued that this was not a loan transaction but rather an investment in real estate through the Entrust Partnership. Despite a lack of traditional loan documentation, the facts suggest otherwise. Panther Mountain, jointly owned by the debtors, filed its own Chapter 11 bankruptcy on September 20, 2009. (Arvest Ex. 5.) On its schedules, Panther Mountain listed the IRA, not the Entrust Partnership, as an unsecured creditor for $163,000.00; the claim is described as "50%

---

[2] The de minimis $411.82 "Business Expense" on October 15, 2008, could also qualify as a prohibited transaction.

12

Interest in new entity." (Arvest Ex. 5, at 4, 11, 17–18.) This figure approximates Panther Mountain's $163,354.49 cash contribution to the Entrust Partnership that was ambiguously due "[a]t construction completion" and equals the IRA's immediate obligation to make a non-cash contribution of $122,830.56, representing the purchase price of the property, and a cash contribution of $40,523.93 to develop the property. (Debtor Ex. 2 at 1.) The aggregate of the non-cash and cash contributions is $163,354.49. This treatment, as listed on the Panther Mountain schedules, is more consistent with Panther Mountain using the IRA as a lending source for the purchase price and development of the four-acre tract without any real commensurate obligation by Panther Mountain to do anything other than perhaps contribute an equal amount at an unspecified and ambiguous date.

Further, and cumulatively, Barry Kellerman transferred or used "the income or assets of [the IRA]" for the benefit of each of the aforementioned disqualified persons and as a fiduciary dealt with "the income or assets of [the IRA] in his own interest or for his own account." 26 U.S.C. § 4975(c)(1)(D),(E). Barry Kellerman, as the owner and fiduciary of the IRA, (1) orchestrated the IRA's membership in the Entrust Partnership with Panther Mountain, (2) signed the Buy Direction Letter and the Sale Letter that facilitated the purchase of the four acres solely by the IRA but held with Panther Mountain as tenants in common, and (3) directed the payment of "Business Expense[s]" by the IRA to develop the four-acre tract. The real purpose for these transactions was to directly benefit Panther Mountain and the Kellermans in developing both the four acres and the contiguous properties owned by Panther Mountain. The Kellermans each own a 50 perecent interest in Panther Mountain and stood to benefit substantially if the four-acre tract and the adjoining land were developed into a residential subdivision. Similar to the petitioner in *Rollins*, the Kellermans utilized the IRA to indirectly "secur[e] [additional] financing" for their

13

existing Panther Mountain development "without having to deal with independent lenders." *Rollins*, 2004 WL 2580602, at *10. Thus, the Kellermans utilized the income and assets of the IRA for their benefit, as disqualified persons, in violation of subsection 4975(c)(1)(D). Alternatively, Barry Kellerman dealt with the income or assets of the IRA as a fiduciary for his own interest in violation of subsection 4975(c)(1)(E). The first transaction—the non-cash contribution—occurred on or about August 8, 2007, and the second transaction—the cash contribution—occurred on or about December 5, 2007. Therefore, based on the prohibited transactions engaged in by disqualified persons, the IRA ceased being tax exempt as of January 1, 2007, pursuant to 26 U.S.C. § 408(e). Thus, the debtors may not claim any interest in the IRA as exempt under 11 U.S.C. § 522(d)(12) of the United States Bankruptcy Code.

## IV. Conclusion

For the aforementioned reasons, the objections filed by the Trustee and Arvest are sustained.

IT IS SO ORDERED.

Dated this 26th day of May, 2015.

_____
HONORABLE RICHARD D. TAYLOR
UNITED STATES BANKRUPTCY JUDGE

cc: Barry K. Kellerman
     Dana M. Kellerman
     Danny R. Crabtree
     M. Randy Rice
     Hamilton M. Mitchell
     Stephen L. Gershner